UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

JANE DOE,

                     Plaintiff,

                v.

FELICIAN UNIVERSITY,

                     Defendant.
_____

: Civ. Action. No.:
:
: **COMPLAINT**
:
:
:
:
:
:
:
:
:

Plaintiff Jane Doe, by and through the undersigned attorneys, allege as follows:

## INTRODUCTION

1. Ms. Doe, a former student at Defendant Felician University, brings this action to remedy:

   a. Discrimination on the basis of creed, ancestry and national origin in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq.;

   b. Discrimination on the basis of race and national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.;

   c. Defamation;

   d. Breach of Contract;

   e. Intentional Infliction of Emotional Distress; and

   f. Battery.

1

## JURISDICTION

2. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, as this action seeks redress for the violation of Plaintiffs' federally protected constitutional and civil rights.

3. Plaintiffs further invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. § and 1367(a), over any and all claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

4. Plaintiffs' claim for injunctive relief is authorized by Federal Rules of Civil Procedure 65.

## VENUE

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, as Defendant Felician University is located in this judicial district, and a substantial part of the events giving rise to this claim occurred in this judicial district.

## PARTIES

6. Plaintiff Jane Doe is a Muslim woman of Palestinian descent residing in Bergen County, New Jersey and was enrolled as a student at Defendant Felician University.

7. Defendant Felician University is a private Roman Catholic university with its primary campus located at 1 Felician Way, Rutherford, NJ.

## STATEMENT OF FACTS

8. Plaintiff Jane Doe is a Muslim woman of Palestinian descent who was born and raised in the United States. As a practicing Muslim, Ms. Doe also dons the headscarf known as *hijab*.

9. Ms. Doe enrolled in Felician University (hereinafter "University") in August 2014 to pursue an education in nursing.

10. Throughout her time at the University Ms. Doe experienced discrimination and harassment due to her creed, national origin and ancestry by the faculty, staff and students at the University.

11. The University's malicious, discriminatory actions directly led to severe and extreme emotional distress, severe physical injury, and economic damages as she was denied a nursing degree.

12. In or around January 2015, students in Ms. Doe's Global Issues in Health class began posting inflammatory and untrue things about Muslims and Middle Eastern countries. The students were cyberbullying Ms. Doe and in one post even physically threatened her by stating "This is going to get physical."

13. The class's professor, Sara Thompson was also a contributor to the blog. Ms. Doe made Thompson aware of the harassment taking place on these blogs. Thompson took no action in response.

14. At this time, Ms. Doe began counseling with Mr. Ben Silverman due to increasing fear and anxiety.

15. In another class taught by Father John O'Neill, O'Neill asked all the students, "anyone in here not Catholic?" When he saw Ms. Doe, he pointed to her and said out loud, "You! Muslim! Does your religion tell you to kill people?"

16. Ms. Doe always reported incidents of discrimination to various faculty and staff at the University. However, almost all of her complaints were dismissed outright and no action was taken.

17. In or around May 2015, Ms. Doe was unfairly given a "B" grade in her Global Issues in Health class.

18. Ms. Doe emailed Thompson asking to see the grading rubric. In response Thompson immediately changed the grade to an "A" grade.

19. Throughout Ms. Doe's time at the University, professors intentionally gave her a lower grade (and sometimes a failing grade) with discriminatory animus against Ms. Doe. Each time Ms. Doe had to go through a painstaking and time-wasting process of grade appeals and follow ups in order to get a fair grade.

20. Ms. Doe again had Thompson as a professor in the following semester in a class entitled Patient Family Community Education.

21. Throughout this class, Thompson made disparaging comments about Muslims and would not allow students to do a group project about culturally competent care to Muslims.

22. Other students also felt that Thompson did not like Muslims.

23. In or around August 2015, Ms. Doe took a course with Professor Annette Minors called Health Assessment. Minors required all students to strip down to a tank tops and shorts and conduct very intimate body probing on each other.

24. As a devout Muslim, Ms. Doe maintains a very strict sense of modesty. Ms. Doe sought to be excused from this exercise due to her religious beliefs. Further, this exercise was not something commonly done in nursing curriculums.

25. Minors refused to excuse Ms. Doe from the exercise and furthermore, to make matters worse, assigned Ms. Doe a partner who was one of the hostile students who had been bullying. Minors made such assignment with a malicious and discriminatory intent against Ms. Doe.

26. Ms. Doe was not excused from the exercise, but had to plead with Dean Zweighaft to assist in at least being able to choose her own partner. Zweighaft allowed Ms. Doe to do so only after Mr. Silverman made the request. Zweighaft told Ms. Doe that she "was becoming a problem."

27. Ms. Doe had to take abusive remarks from every level of the University and was still subjected to the body probing exercise that she should have been excused from on the grounds of religious accommodation.

28. Ms. Doe felt assaulted and violated every time she was forced to undress and have another student inspect and put their hands on her body. The University obtained her consent through force and duress.

29. Minors was still furious that Ms. Doe was able to choose her own partner and so she screamed and berated her out of discriminatory animus.

30. In or around October 2015, Ms. Doe was approved for a disability plan for hearing impairment and mental health issues. As a part of the 504 disability accommodation, Ms.

Doe was permitted to record lectures and was allotted extended time for tests and assignments.

31. During one class, Minors singled out Ms. Doe and told her to stop recording the lecture because she didn't know who Ms. Doe was going to talk to. Minors did this despite knowing full well that Ms. Doe was on a disability accommodation.

32. In or around November 2015, a student at the University called Ms. Doe an "ISIS bitch." Ms. Doe reported the incident to the University but no action was taken.

33. Around the same time, following the terrorist attacks in Paris, France, VP Fitzpatrick sent out a school-wide email to watch for signs of terrorism on campus. After receipt of this email, students began to harass the Muslim students on campus. One particular female Muslim student received so many threatening texts that she ceased to wear her hijab and Muslim attire. When she complained, she was forced to sign an agreement that if she complained again, she would be expelled from the University. Incidents like this highlight the Islamophobic atmosphere at the University.

34. During this time, Ms. Doe was in the cafeteria and a group of students at the next table began shouting threats such as "blowing up the whole Middle East because evil Muslims want to take over the world." Ms. Doe reported this incident immediately to Father Kelly, who simply shrugged and walked away.

35. In December 2015, The U.S. Department of Education and Department of Justice ("Departments") issued a guidance to colleges and universities on how to protect vulnerable Arab, Muslim and Sikh students in the wake of the Paris attacks. The guidance advised universities to treat all anti-Muslim incidents seriously and conduct full

investigations and action. Further, universities were recommended to publicize policy statement on discrimination and harassment.

36. The University ignored this guidance completely and took none of these steps. In fact, through its conduct, it actually sought to further discrimination and harassment against Arabs and Muslims.

37. In a November 18, 2015 meeting, Ms. Doe expressed her concerns about cultural bias displayed by the faculty at the University. VP Fitzpatrick indicated that he would do a cultural awareness training for all students. No such training was ever done.

38. In or around December 2015, Ms. Doe's EOF counselor, Ms. Garland met with Zweighaft, Dean Shore, and VP of Academic Affairs Edward Ogle. The meeting was called to address concerns of harassment raised by Ms. Doe. Instead the panel only questioned Ms. Garland on Ms. Doe's character. When Ms. Garland attempted to shift it back to discrimination, she was dismissed from the meeting.

39. In or around December 2015, Minors violated Ms. Doe's 504 disability accommodation during a make up exam. Minors changed the exam so it would only be 35 questions instead of 50 questions. This means that each question carried more weight—a clear disadvantage.

40. Afterwards, Minors refused to allow Ms. Doe to see her grade on the make up exam. Ms. Doe had to go to Zweighaft for assistance. A review of the exams revealed multiple grading errors. Zweighaft changed Ms. Doe's grades on two exams but got fed up and refused to correct the final exam grade.

41. On December 11, 2015, Ms. Doe addressed her concern with grading with VP Ogle. He stated that she can always request a review of the grades. His response was contrary to the University's Students Rights manual.

42. By now it was clear that the University was systematically discriminating against Ms. Doe due to her religion. This was taking a serious toll on Ms. Doe's health both emotionally and physically.

43. In or around January 2016, Ms. Doe registered for courses in Section B and was relieved that the professors in that section were not discriminating or harassing. Her relief was short lived as Zweighaft had her transferred back to Section A classes where she was met with discrimination and harassment.

44. Zweighaft further berated and reprimanded her for attempting to register in classes in a different section.

45. Ms. Doe's health continued to deteriorate and she began having panic attacks.

46. In February 2016, Professor Conlon-Yoo affirmed the notion that terrorism and suicide bombings are accepted in the Middle East. Ms. Doe rejected that notion as untrue and as fueling hatred and intolerance. Conlon-Yoo did nothing to correct or address this matter in class.

47. This continued to make Ms. Doe more sick and depressed.

48. In February 2016, during a med-surgical clinical rotation, the University assigned Ms. Doe to Nurse Mack who has hostile and uncommunicative.

49. The University further assigned Ms. Doe to a patient who had a highly communicable infection and did not notify Ms. Doe of that fact. This was a huge threat to not only Ms. Doe but anyone she came in contact with.

50. Ms. Doe complained to the University about her exposure to a highly communicable disease and what would be done to protect safety in the future. She received no response.

51. Ms. Doe also spoke to Mr. Wentworth regarding discrimination at the University. Mr. Wentworth was initially sympathetic and also disturbed by textbooks used by the University. However, later he avoided Ms. Doe and told her that he could not help.

52. In March 2016, someone placed a "Warning" prayer in her backpack. The document was subtitled "Crusade Prayer 85 to save the United States from the hand of the deceiver."

53. Ms. Doe reported this to President Anne Prisco who initially took no action. Eventually, the University issued a letter publicly. However, that letter only advised students who experienced any threat or harassment to report it internally within the University.

54. The University dropped any investigation into the actual "Warning" prayer being distributed around campus. The University did not find that it specifically targeted Ms. Doe even though it was placed into her backpack.

55. On March 7, 2016, Ms. Doe went forward and reported all of the discrimination and harassment she had suffered at the University to Human Resources director Virginia Topolski. Ms. Doe provided Topolski with evidence including screenshots of the blog where Thompson had denigrated Muslims and Arabs.

56. Topolski indicated that she had enough evidence to move forward. However, in April 2016, Topolski notified Ms. Doe that there was no indication of harassment or discrimination.

57. Ms. Doe received no further communication from Topolski regarding her complaint.

58. Ms. Doe continued to be harassed and discriminated against at the University. She even received phone calls telling her "Die Muslim bitch" and "kill yourself already."

59. Ms. Doe reached out to various administrators at the University to indicate that the discrimination against her was ongoing and that the letter by President Prisco had had no impact and was not even read by most faculty or students.

60. The University sent her a "cease and desist" letter on May 13, 2016. The University was trying to shut down Ms. Doe's ability to report discrimination and harassment on campus.

61. Immediately thereafter, Thompson gave Ms. Doe a zero grade on her research paper and a failing grade for the class.

62. Ms. Doe had to, once again, go through the process of having a discriminatory and retaliatory grade reviewed.

63. During the appeal process, Ms. Doe was not permitted to bring her counselor, Mr. Silverman.

64. After three meetings, each one upholding the failing grade, Ms. Doe was allowed to file a formal petition to appeal the grade.

65. The three meetings were all meant to further weaken Ms. Doe's fragile emotional state and discourage her from pursuing her right to grade appeal.

66. With the assistance of counsel and an unbiased forum, Ms. Doe won her grade appeal and had it changed from failing to A-.

67. This process represents a microcosm of Ms. Doe's experience at the University. The University intentionally and unnecessarily terrorized her with bad grades and other hurdles purely out of a discriminatory animus only to damage her emotionally and discourage her from continuing on. Eventually, she would overcome, but only after significant toll on her mental and physical wellness.

68. On September 9, 2016, Ms. Doe was participating in a med-surg orientation through the University at Newark Beth Israel Medical Center. Nurse Mary singled out Ms. Doe and pointed to her clean, white *hijab* and stated "that is an example of what you can't wear, it's not clean. I know it's part of your religion but it's dirty." Ms. Doe informed adjunct professor Flores about this incident and that there are thousands of Muslims in the medical profession that wear a *hijab* in sterile environments with no issues. Predictably, she received no response.

69. On September 16, 2016, Ms. Doe attended a clinical with Professor Flores. Flores assigned all the students a patient but did not assign one to Ms. Doe.

70. Flores and Professor Schwade took Ms. Doe into a room and began to intimidate her and ask her why she was "being so difficult."

71. Ms. Doe requested that she not be singled out and discriminated against. Flores responded that she drew attention to herself by the way she dressed (i.e. wearing a *hijab*).

72. Ms. Doe left that intimidating encounter and waited downstairs in the lobby as she had not been assigned a patient by Flores.

73. She received an email from the Schwade indicating that she had failed to return to the clinical.

74. In a follow up report, Schwade made a false and defamatory representation that Ms. Doe had been assigned a patient and that she had abandoned her patient.

75. Nonetheless, Ms. Doe was assigned another clinical on September 23 as a makeup and that she must come to a September 20 meeting with Zweighaft to discuss the events of the first clinical.

76. Ms. Doe retained counsel and her attorney notified Zweighaft that all communication must go through counsel. No one responded to her attorney's email and her attorney advised her not to attend the meeting alone.

77. On the advice of her attorney, Ms. Doe did not attend the meeting.

78. At this point, Schwade advised that she had missed an important meeting and that would be a serious matter. The University purposely did not respond to her attorney in retaliation for her exercising her right to an attorney.

79. On September 23, Ms. Doe attended her clinical and was assigned a very difficult patient. Despite this, Ms. Doe did her best and the attending nurses thanked Ms. Doe for her care of the patient.

80. Meanwhile, Flores was more hostile and eventually asked Ms. Doe where she was from. When Ms. Doe responded "Michigan," Flores responded "no your people, where are they from."

81. The constant discrimination and harassment had taken its toll on Ms. Doe and she was physically very ill at this point. Her doctor advised that she should take a medical leave, which she did on September 29, 2016.

82. In a letter dated October 27, 2016, Zweighaft notified Ms. Doe that her conduct on the clinical of September 16 (abandoning a patient) and her failure to attend the meeting of September 20 constituted a serious violation.

83. Ms. Doe had not abandoned a patient because she had never been assigned one and she did not attend the meeting on advice of counsel who received no response from the University.

84. Ms. Doe was dropped from the nursing program and was unable to earn a nursing degree despite putting in so many years at the University and expending money towards tuition.

85. Ms. Doe had an otherwise outstanding academic record. She even received a 100 grade on her med-surg calculation exam under Schwade. However, solely due to the discriminatory animus she was made to suffer and fail.

86. Ms. Doe was also very healthy and physically fit before she began at the University. However, by the end her physical condition had deteriorated tremendously directly as a result of the discriminatory treatment and harassment she received from the University.

87. Ms. Doe had to have surgery to remove a large growth in her body which also led to the loss of her ovary and both fallopian tubes.

88. To add insult to injury, the University, through Sharon McNulty and Ronald Gray reported Ms. Doe to the Rutherford and Fort Lee Police Departments. In addition, the

University, through Sharon McNulty made a defamatory and untrue statement to the police about Ms. Doe that "she doesn't like the police, I should warn you about that."

89. This statement was made only with the intent that the police department would deal with Ms. Doe more harshly.

90. The police came to Ms. Doe's home anticipating a hostile confrontation. The police further looked out for all cars registered in Ms. Doe's name.

91. In conclusion, the University fosters a culture a discrimination and harassment against Muslims and Arabs and because Ms. Doe spoke up, they retaliated against her constantly until they broke her down completely emotionally, physically and financially. When they had done all that, they sought to continue the harassment by attempting to take away her freedom and have her arrested or even killed.

92. At all times relevant, Professor Sara Thompson, Professor Annette Minors, Dean Elizabeth Zweighaft, President Anne Prisco, Professor Conlon-Yoo, Father John O'Neill, Father Kelly, Professor Joan Flores, Professor Susan Schwade, VP Fitzpatrick, Ian Wentworth, Virginia Topolski, Sharon McNulty and Ronald Gray were acting in their capacity as employees of Felician University.

93. At all times relevant, all the above-referenced conduct by Professor Sara Thompson, Professor Annette Minors, Dean Elizabeth Zweighaft, President Anne Prisco, Professor Conlon-Yoo, Father John O'Neill, Father Kelly, Professor Joan Flores, Professor Susan Schwade, VP Fitzpatrick, Ian Wentworth, and Virginia Topolski, Sharon McNulty and Ronald Gray was done in their capacity as employees of Felician University.

## COUNT ONE
### (Discrimination on the Basis of Creed, Ancestry, and National Origin in Violation of the New Jersey Law Against Discrimination, N.J.S.A 10:5-1 et seq.)

94. Plaintiffs repeat and allege the allegations contained in the preceding paragraphs of this complaint and incorporates such paragraphs by reference.

95. Ms. Doe is part of a protected class pursuant to N.J.S.A 10:5-1 et seq., specifically that of individuals adhering to the creed of Islam.

96. Defendant Felician University is a "place of public accommodation" as defined in N.J.S.A. 10:5-5.

97. Defendant University discriminated against Ms. Doe on the basis of Ms. Doe's creed, ancestry and national origin in all the ways described herein including but not limited to removing Ms. Doe from the nursing program.

98. Defendants' discriminatory conduct was malicious, and wantonly and willfully disregarded Ms. Doe's rights, thereby entitling Ms. Doe to compensatory and punitive damages pursuant to the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-1 et seq.

## COUNT TWO
### (Race and National Origin Discrimination in Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.)

99. Plaintiffs repeat and allege the allegations contained in the preceding paragraphs of this complaint and incorporates such paragraphs by reference.

100. Ms. Doe is part of a protected class pursuant to 42 U.S.C. § 2000d, specifically the class of individuals having "Arab and/or Middle Eastern" origin.

101. At all times relevant to this action, Defendant Felician University is a "program or activity" as defined in 42 U.S.C. § 2000d-4a, specifically a public college.

102. At all times relevant to this action, Defendant Felician University was receiving federal financial assistance.

103. Defendant Felician University denied benefits to Ms. Doe and subjected Ms. Doe to discrimination on the basis of her race and national origin in violation of 42 U.S.C. § 2000d in all the ways described herein including but not limited to dropping her from the nursing program.

104. Defendants' discriminatory conduct was malicious and recklessly indifferent to Ms. Doe's federally protected rights, entitling Ms. Doe to compensatory and punitive damages pursuant to 42 U.S.C. § 1981a.

## COUNT THREE
**(Defamation)**

105. Plaintiffs repeat and allege the allegations contained in the preceding paragraphs of this complaint and incorporates such paragraphs by reference.

106. Defendant University's statement that Ms. Doe did not like law enforcement was false and defamatory.

107. Defendant University's statement concerned a private figure on an exclusively private concern and knew that the statements were false, and/or acted in reckless disregard of their truth or falsity, and/or acted negligently in failing to ascertain the truth or falsity of the statements before communicating it, or concerned a public matter and acted with actual malice.

108. Defendant University communicated its defamatory statements to third persons, including officers of the Rutherford and Fort Lee Police Departments.

109. As a direct and proximate result of Defendant University's defamatory statement, Plaintiff suffered damages including harm to her reputation.

## COUNT FOUR
### (Breach of Contract)

110. Plaintiffs repeat and allege the allegations contained in the preceding paragraphs of this complaint and incorporates such paragraphs by reference.

111. Defendant University had entered into a valid contract with Plaintiff in consideration for the tuition Plaintiff paid to Defendant University.

112. The contract provided that Defendant University provide Plaintiff with a fair and honest grading system for all exams, clinics and assignments and an environment free of discrimination and harassment.

113. The contract further provided that the Defendant University provide Plaintiff with a degree nursing upon her successful completion of the coursework in the nursing program.

114. Plaintiff complied with the contract by making full payments of the tuition.

115. Defendant University breached the contract by failing to provide Plaintiff with an environment free of discrimination and harassment.

116. Defendant University breached the contract by not providing Plaintiff with a fair and honest grading system.

117. Defendant University breached the contract by failing to confer Plaintiff with a nursing degree even though she fulfilled all the requirements of the nursing program or would have fulfilled all the requirements of the nursing program but for Defendant University's intentional and malicious misconduct.

118. As a result of Defendant University's breach, Plaintiff suffered damages including severe emotional distress, physical injuries and economic damages.

## COUNT FIVE
### (Intentional Infliction of Emotional Distress)

119. Plaintiffs repeat and allege the allegations contained in the preceding paragraphs of this complaint and incorporates such paragraphs by reference.

120. Defendant University acted intentionally and maliciously in deliberate disregard of a high degree of probability that emotional distress will follow. This is especially true considering that the Defendant University knew or should have known that Plaintiff was being treated for mental health issues.

121. Defendant University's discriminatory conduct was extremely outrageous and malicious and beyond the bounds of decency.

122. As a direct and proximate cause of Defendant University's conduct, Plaintiff suffered and continues to suffer from severe emotional distress which no reasonable person could be expected to endure.

## COUNT SIX
### (Battery)

123. Plaintiffs repeat and allege the allegations contained in the preceding paragraphs of this complaint and incorporates such paragraphs by reference.

124. Defendant University, through the conduct of its employee Professor Minors, intentionally subjected Ms. Doe to inappropriate probing of her body against her objection.

125. The Defendant University knew that the touching was contrary to Ms. Doe's religious beliefs and psychologically harmful for her.

126. The Defendant University obtained Ms. Doe's consent through extreme force and duress.

127. As a direct and proximate cause of Defendant University's conduct, Ms. Doe suffered severe emotional distress, physical injuries and economic damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment as follows:

128. That the Court grant Plaintiff compensatory damages for the humiliation, emotional distress, and other damages caused by Defendant's conduct;

129. That the Court grant Plaintiff compensatory damages for the physical injuries she suffered as a result of Defendant's conduct.

130. That the court grant Plaintiff punitive damages for Defendant's intentional and malicious conduct;

131. That the Court order Attorney's fees to Plaintiffs pursuant to N.J.S.A. § 10:5-27.1; and

132. That the Court order Attorney's fees to Plaintiffs pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues in the above-entitled cause of action.

Dated: September 4, 2018

>Respectfully submitted,
>
>Tariq Hussain, Esq.
>**HUSSAIN & KHAN LLP**
>*Attorneys for Plaintiff*
>100 Challenger Road, 8th Floor
>Ridgefield Park, NJ 07660
>T. 201.500.7522
>F. 201.402.1020
>thussain@haklawfirm.com